Mary STOUT, Kenneth Debus, Daniel
Gulini And Lee Hedden,
Plaintiffs,

v.

BETHLEHEM STEEL CORPORATION,
et al., Defendants.

Civil Action No. 95 CV 0193.

United States District Court,
E.D. Pennsylvania.

March 18, 1997.

674

Elliot A. Strokoff, Strokoff & Cowden, P.C., Harrisburg, PA, for plaintiffs.

G. Stewart Webb, G. Stewart Webb, Jr., J. Preston Turner, Venable, Baetjer and Howard, Baltimore, MD, Kathleen M. Mills, Bethlehem Steel Corp., Bethlehem, PA, for defendant Bethlehem Steel Corp.

G. Stewart Webb, Venable, Baetzer & Howard, Baltimore, MD, Kathleen M. Mills, Bethlehem Steel Corp., Bethlehem, PA, for defendant Pension Plan of Bethlehem Steel Corp. and Subsidiary Companies.

*DECISION AND ORDER*

VAN ANTWERPEN, District Judge.

### I. INTRODUCTION

This case arose originally under Section 510 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140. We have jurisdiction pursuant to Section 502 of ERISA, 29 U.S.C. § 1132(e) and under 28 U.S.C. § 1331. On January 12, 1995 Plaintiffs Mary Stout, Kenneth Debus, Daniel Gulini and Lee Hedden filed an action against Defendant Bethlehem Steel Corporation alleging unlawful interference with ERISA rights, and breach of the implied covenant of good faith and fair dealing in their employment contracts. Defendants were granted summary judgment on the breach of contract claim per our order of February 26, 1996.

We began to conduct a non-jury civil trial on April 16, 1996; however, we discontinued and postponed the balance of the trial to

allow plaintiffs time to internally appeal the administrative decision denying them benefits. Plaintiffs subsequently filed an amended complaint on July 26, 1996 adding as defendants the Pension Plan of Bethlehem Steel Corporation and Subsidiary Companies, applicable to eligible salaried employees, the General Pension Plan and the Plan Administrator and alleging the further violation of ERISA under 29 U.S.C. § 1132 for failure to pay retirement benefits. On November 19, 1996, we resumed the nonjury trial, which continued until November 20, 1996. On that day, Plaintiffs and Defendants also filed a stipulation of agreed upon facts. Pursuant to Federal Rule of Civil Procedure 52(a), we make the findings of fact as set forth below.[1]

## II. FINDINGS OF FACT

### The Parties and The Plan

1. Plaintiff Mary Stout was born on September 5, 1951, and started her employment with Bethlehem Steel Corporation on December 22, 1969. In January 1993, she was earning an annual salary of $30,396. *Stipulation 1*. Plaintiff Kenneth Debus was born on April 5, 1945, and started his employment with Bethlehem Steel Corporation on June 3, 1968. In January 1993, he was earning an annual salary of $33,456. *Stipulation 2*. Plaintiff Daniel Gulini was born on April 23, 1945, and started his employment with Bethlehem Steel Corporation on June 21, 1966. In January 1993, he was earning an annual salary of $33,540. *Stipulation 3*. Plaintiff Lee Hedden was born on October 29, 1946, and started his employment with Bethlehem Steel Corporation on May 18, 1970. In January 1993, he was earning an annual salary of $30,696. *Stipulation 4*.

2. Defendant Bethlehem Steel Corporation ("Bethlehem") is a Delaware corporation with its principal place of business in Bethlehem, Pennsylvania. Bethlehem has historically operated facilities at various locations around the country. Since at least the early 1980's, Bethlehem has been reducing or eliminating facilities and reducing the size of its workforce. In January of 1993, among the facilities that Bethlehem has operated and continues to operate are a steel plant in Burns Harbor, Indiana and a steel plant in Sparrows Point, Maryland, as well as plants in Lackawanna, New York, Steelton, Pennsylvania and Bethlehem, Pennsylvania. *Stipulation 114*.

3. Each of the Plaintiffs was a Customer Service Representative in the Tin Mill Products Group, located in Bethlehem, Pennsylvania. *Stipulation 39*. The Customer Service Representative position held by each Plaintiff was classified as an exempt, non-union, salaried position. *Stipulation 40*. In June, 1993, the Tin Mill Products Group consisted of: a General Manager; a Technical Service Manager; a Tin Mill Marketing Specialist; a Customer Service Supervisor; 7 Customer Service Representatives; 2 Administrative Clerks; and a Secretary. The positions of Administrative Clerk and Secretary were classified as non-exempt salaried positions. The other positions in the Tin Mill Products Group were exempt salaried positions. *Stipulation 41*.

4. Bethlehem is the sponsor of a defined benefit pension plan for its employees. The plan is named the Pension Plan of Bethlehem Steel Corporation and Subsidiary Companies ("Plan"). It is subject to and regulated by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). *Id.* at 63–64 (Dopera). The Plan is also a qualified pension plan under the Internal Revenue Code. Bethlehem funds the Plan. Employees do not make any contributions to the Plan. *Stipulation 5*. The Plan of Bethlehem and its Subsidiary Companies is an umbrella pension plan that contains subplans that apply to different employee groups. Tr. 11/19/96 at 30 (Dopera).

1. References in the findings of fact are to numbered trial exhibits, trial transcripts with date and page indicated, to deposition designations, and to the stipulated facts. With the deposition designations, the page numbers reference the pages on the designations, not the actual depositions, unless otherwise noted. Prior to trial, the parties submitted a stipulation containing 116 separate stipulations of fact. For purposes of efficiency, we have combined several of these, and arranged them with our findings of fact in a chronological order. We will reference them as, e.g., "Stipulation 1."

5. Michael Dopera has worked in the area of employee benefits at Bethlehem since 1968, and he has had responsibility for pension benefits since 1973. Tr. 11/19/96 at 62–63 (Dopera). Mr. Dopera is currently employed by Bethlehem as its Manager of Pension Plans and Communications in the Compensation and Benefit Services Division; he is the Plan Administrator of the Pension Plan of Bethlehem Steel Corporation and Subsidiary Companies. He also serves as the Secretary of the Employee Benefits Administration Committee. *Stipulation 70;* Tr. 4/16/96 at 17–18 (Dopera). The Plan specifically provides that the Secretary shall also be the Plan Administrator. Defendants' Exhibit 2 at p. 96. In addition, Bethlehem has historically had a policy where the person in charge of pension benefits, now Mr. Dopera, has also been the Secretary· of the General Pension Board (now the Employee Benefits Administration Committee). Tr. 11/19/96 at 73 (Dopera). In 1993, Mr. Dopera was Bethlehem's Manager of Employee Benefits and served as the Secretary of the General Pension Board, the Employee Benefits Administration Committee's predecessor, and as such was the Plan Administrator of the Pension Plan. Tr. 4/16/96 at 17–18 (Dopera); *See* Defendants' Exhibit 1 at p. 97. Mr. Dopera has been an Assistant Secretary or Secretary of the General Pension Board / Employee Benefits Administration Committee since at least the early 1980's. Tr. 4/16/96 at 19–20 (Dopera). In his role as Plan Administrator, Mr. Dopera is and was responsible for the day-to-day administration of the Pension Plan, including granting pensions provided by the Plan and making and enforcing the rules and regulations of the General Pension Board / Employee Benefits Administration Committee. Tr. 4/16/96 at 15–17 (Dopera); Tr. 11/19/96 at 71–72 (Dopera).

6. Plaintiffs are all participants in the Plan. Their level of benefits thereunder is set forth in the Plan as applicable to non-represented salaried employees (hereinafter the "Salaried Plan"). Defendants' Exhibit 1 is a genuine and authentic copy of the Salaried Plan in effect, and applicable to Plaintiffs, at the time of the Plaintiffs' layoffs in 1993. Defendants' Exhibit 2 is a genuine and authentic copy of the Salaried Plan in effect,

and applicable to Plaintiffs, at the time their continuous service broke in October, 1995. *Stipulation 6.*

7. The contents of the Salaried Plan, including its eligibility provisions and benefits, are established by Bethlehem Steel Corporation's Board of Directors. Tr. 11/19/96 at 65 (Dopera). In contrast, benefits available to employees represented by the United Steelworkers of America are set forth in a separate sub-plan, and the pension benefits afforded to those employees are determined by collective bargaining that results in a Pension Agreement between Bethlehem and the United Steelworkers. Tr. 11/19/96 at 65, 203 (Dopera, Kesselring). The Plaintiffs are not in any group of employees represented by the United Steelworkers; and no Plaintiff has ever been a participant in or covered by any pension plan or agreement negotiated by the United Steelworkers. Specifically, Plaintiffs are not and never have been covered by the Hourly Pension Plan or the Pension Agreement between Bethlehem and the United Steelworkers. Tr. 11/19/96 at 83 (Dopera).

8. During the course of their employment, Plaintiffs, and other non-represented salaried employees of Bethlehem, were provided with Summary Plan Descriptions which described the benefits available under the Salaried Plan. Defendants' Exhibit 3 is a genuine and authentic copy of the Summary Plan Description in effect at the time of Plaintiffs' layoffs in October, 1993. *Stipulation 7.*

9. Section 9 of the 1994 Salaried Plan (Defendants' Exhibit 2) deals with administration of the Plan. As explained by Mr. Dopera at trial, that Section gives the Employee Benefits Administration Committee the power to interpret the Plan, to administer the Plan and to make various administrative decisions with respect to the operation of the Plan. Tr. 11/19/96 at 69–70 (Dopera). In pertinent part, Section 9 contains the following provisions: the Employee Benefits Administration Committee "shall have the authority and responsibility for the administration of this Plan ... and shall appoint a Secretary and such Assistant Secretaries as

it shall deem necessary or proper." The Secretary of the Employee Benefits Administration Committee "shall be the administrator of this Plan (hereinafter 'Plan Administrator') for all purposes of ERISA with the powers and duties provided therein and in this Plan...." The Plan Administrator shall "make and enforce such rules and regulations as the Plan Administrator shall deem necessary or proper for the efficient administration of this Plan, and ... decide such questions as may arise in connection with the operation of this Plan." Further, "If any difference shall arise ... with respect to a determination of the Plan Administrator ... [the affected person] may request a review of the matter by the Committee [Employee Benefits Administration Committee]...." Finally, "The Committee [Employee Benefits Administration Committee] shall have full power and authority to interpret or construe any provision of the Plan which may be ambiguous, or with respect to which there is any disagreement between the Plan Administrator and any Participant ...." and "decisions of the Committee [Employee Benefits Administration Committee] shall be final and binding...." Defendants' Exhibit 2 at pp. 96–97. Defendants' Exhibit 1, which is the 1989 Salaried Plan in effect when Plaintiffs were laid off on October 31, 1993, grants the same powers and authority to the General Pension Board and the Plan Administrator under the 1989 Salaried Plan. *See* Defendants' Exhibit 1 at pp. 97–98. This is no difference between the powers and authority of the General Pension Board and the Employee Benefits Administration Committee under the two Plans. Tr. 11/19/96 at 68–69 (Dopera).

10. The Salaried Plan provides for a variety of different forms of retirement benefits and each form of retirement benefit has its own eligibility criteria, which are set out in the Salaried Plan. The different forms of retirement benefits provided under the Salaried Plan include the following: 30–Year Retirement; Normal Age (65) Retirement; 62/15 Retirement; 60/15 Retirement; Rule–of–70 Retirement; Rule–of–80 Retirement; Rule–of–65 retirement; 40/15 Deferred Vested Retirement; Deferred Vested Retirement. *Stipulation 8.*

11. By memorandum dated September 16, 1982, Clifford W. Ishmael, Manager of Personnel, issued "Guidelines for Reduction of Salary Forces in Home Office Departments." Defendants' Exhibit 43 is a genuine and authentic copy of these Guidelines. *Stipulation 112.* By memorandum dated March 6, 1992, Leonard Kesselring, whose title was then Director of Personnel and Equal Employment, issued guidelines on "Home Office Non–Represented Salaried Force Reductions." This memorandum supplemented an earlier memorandum, dated December 17, 1990, issued by Mr. Kesselring on "Reduction of Non–Represented Salaried Forces" which was attached to Mr. Kesselring's March 6, 1992 memorandum. Defendants' Exhibit 44 contains genuine and authentic copies of Mr. Kesselring's memoranda. *Stipulation 113.*

*Rule–of–65*

12. The benefit at issue in this case is the Rule–of–65 Retirement benefit. *Stipulation 9.* The Rule–of–65 Retirement benefit was added to the Salaried Plan effective January 1, 1978. *Stipulation 10.* Paragraph 2.7 of the Salaried Plan sets forth the eligibility requirements for a Rule–of–65 Retirement benefit for non-represented salaried employees. *Stipulation 12.*

13. The Rule–of–65 Retirement was originally brought into Bethlehem's pension plans as a result of industry-wide collective bargaining. Tr. 11/19/96 at 33–35 (Dopera). Bethlehem extended the general concept of the Rule–of–65 Retirement Benefit to non-represented salaried participants in the Salaried Plan effective January 1, 1978. *Id.* at 78–80, 122 (Dopera); *see also* Defendants' Exhibit 4 at p. 93. The Preamble to the Special Rules with Respect to Rule–of–65 Retirement as set out in the Pension agreement states that the intent behind creating the Rule of 65 was "to provide increased economic protection for long-service employees who are involuntarily displaced from their jobs. The parties agree that the method of achieving this objective is to facilitate the placement of such employees in suitable long-term jobs and, when such jobs are not available, to reduce the adverse economic

consequences to such employees by providing eligible employees with extended SUB and Rule-of-65 pensions as outlined herein." Def. Exh. 4 at p. 93; *Stipulation 11.*

14. The Rule-of-65 Retirement under the Salaried Plan is available to individuals with at least twenty years of continuous service, where the total of his or her age and continuous service equals at least 65 but is less than 80. Def. Exh. 3 at 18. It is triggered by the employee's involuntary break in service at Bethlehem, caused either by a shutdown or by a layoff in excess of 2 years. Tr. 11/19/96 at 84–85 (Dopera). In either event, the employee is not eligible for a Rule-of-65 Retirement if he or she has been offered suitable long-term employment ("SLTE") with the Company. *Id.* (Dopera); Defendants' Exhibit 3 at 18–19. An offer of SLTE disqualifies the employee from becoming eligible for a Rule-of-65 Retirement, regardless of whether the employee's service is broken by a shutdown or a 2-year layoff. The SLTE provision in Paragraph 2.7 of the Salaried Plan applies to both of the contingent employment events that may trigger a Rule-of-65 Retirement. Tr. 11/19/96 at 85–86 (Dopera).

15. As of both January and October, 1993, each of the Plaintiffs met the age and service requirements for a Rule-of-65 Retirement benefit. *Stipulation 13.*

16. Under the terms of the Salaried Pension Plan, where Bethlehem has offered employment to an employee otherwise eligible for a Rule-of-65 Retirement, whether or not the offered employment constitutes suitable long-term employment "is determined in accordance with rules and regulations adopted by the General Pension Board." Paragraph 2.7 of the 1989 Salaried Pension Plan (Defendants' Exhibit 1 at p. 11) and Paragraph 2.7 of the 1994 Salaried Pension Plan (Defendants' Exhibit 2 at p. 14).

17. Defendants' Exhibit 5 is a genuine and authentic copy of a memorandum dated December 16, 1981 from C.W. Ishmael, then Bethlehem's Manager of Personnel, setting forth a definition of SLTE. *Stipulation 15.* Mr. D.W. Kempken, Mr. Dopera's predecessor as Plan Administrator, participated in the preparation of the December 16, 1981 memo-

randum defining suitable long-term employment. Tr. 11/19/96 at 94–95 (Dopera). At a meeting on February 16, 1984, the General Pension Board adopted "Rules and Regulations Governing SLTE" using Ishmael's memorandum. Tr. 11/19/96 at 93–95 (Dopera). Defendants' Exhibit 6 is a genuine and authentic copy of those Rules and Regulations. Tr. 11/19/96 at 96 (Dopera). Defendants' Exhibit 7 is a genuine and authentic copy of the Minutes of the February 16, 1984. *Stipulation 16.* At that meeting, the General Pension Board adopted separate rules and regulations on SLTE for the various subplans under the umbrella Pension Plan. Tr. 11/19/96 at 96 (Dopera). The rules and regulations for SLTE in Exhibit 6 are different for the Salaried Plan and for the Steelworkers' Hourly Plan. *Id.* (Dopera). The rules and regulations for these two Plans are different, because the provisions in the Salaried and Hourly Plans that govern the Rule-of-65 Retirement and how it is defined are different. *Id.* (Dopera). At a meeting on February 24, 1985, the General Pension Board adopted an amendment to its Rules and Regulations on SLTE for the Salaried Plan. Defendants' Exhibit 8 is a genuine and authentic copy of the amended Rules and Regulations. Defendants' Exhibit 9 is a genuine and authentic copy of the Minutes of the September 24, 1985 meeting. *Stipulation 17.;* Tr. 11/19/96 at 97–98 (Dopera).

18. The amended Rules and Regulations Governing SLTE marked as Defendants' Exhibit 8 were in effect, and applicable to Plaintiffs, at the time of Plaintiffs' layoffs in October, 1993 and at the time their continuous service with Bethlehem broke in October, 1995. *Stipulation 18.* As defined in the Summary Plan Description for the Salaried Plan, "a job offered by the Company will be considered suitable long-term employment" if:

• The employee is physically able to perform the job; and

• The employee has or can acquire through training the ability and skills needed to perform the job; and

• It is not a temporary job; and ...

- it is in a different geographic area as determined by the Plan Administrator at a "rate of pay of at least 85% of the employee's last pay rate . . . ."

Defendants' Exhibit 3 at 19. Bethlehem's practice is to consider any job more than 100 miles away from the employee's previous job location as being in a different geographic area. (Tr. 11/19/96 at 60 (Dopera)).

19. Pursuant to Federal Rule of Evidence 201, we take judicial notice that Sparrows Point is approximately 160 miles from Bethlehem. *See also* Tr. 11/20/96 at 211 (Kesselring) ("it takes me two hours and forty-five minutes").

20. As of November 30, 1995, a total of 3,245 former Bethlehem employees were receiving Rule–of–65 Retirement benefits under the Plan. *Stipulation 19.*

*The Move to Sparrow's Point*

21. In 1983, Bethlehem established a dedicated sales and marketing force in connection with its Tin Mill products. This group became known as the Tin Mill Products Group, and it was part of the Marketing Division within Bethlehem's Commercial Department. *Stipulation 20.* Defendants' Exhibit 15 is a genuine and authentic copy of a letter dated March 6, 1992 from Leonard C. Kesselring, Jr., then Bethlehem's Director of Personnel and Equal Employment, to Mr. Edward A. Kloo. *Stipulation 21.*

22. During 1992, a special task force was created to study the existing interrelationship between Bethlehem's Operations and Commercial Departments and develop recommendations which could facilitate increased cooperation between the two areas, improve overall efficiency and enhance customer service. *Stipulation 22.* This task force was referred to as the Com–Ops Team. *Stipulation 23.*

23. The Com–Ops Team reported its recommendations to Senior Management in the late Fall of 1992. *Stipulation 24.* The Com–Ops Team recommended that separate business units be created at Bethlehem's Burns Harbor facility and at its Sparrows Point facility. These business units were named the Burns Harbor Division and the Sparrows Point Division. Each business unit was to be responsible for its own marketing, operations and financial performance. *Stipulation 25.* The Com–Ops Team's report included a recommendation that the marketing and customer service functions for each product area be consolidated and relocated to the business units which manufactured those products. *Stipulation 26.*

24. In 1992, Bethlehem's Senior Management adopted the recommendations of the Com–Ops Team that the Burns Harbor and Sparrows Point Divisions be created as separate business units, and that the marketing and customer service functions for each product area be consolidated and relocated to the business units where the products were manufactured. *Stipulation 27.* George Silagyi was a Manager in the Tin Mill Products Group and served as a member of the Com–Ops Team. Defendants' Exhibit 50; Silagyi Deposition at 7, 19–36. He testified that as part of the formation of those divisions, the Product Marketing Groups located in Bethlehem, Pennsylvania were to be transferred to the Sparrows Point and Burns Harbor facilities. Tr. 11/19/96 at 204–05 (Kesselring). Bethlehem wanted to have customer service personnel located at the operations where the products were manufactured so they could be directly tied in with the mills and the people who were manufacturing the product. Bethlehem believed that this would provide for better service to its customers and better delivery of its products. *Id.* at 205–06 (Kesselring). We find this testimony credible. One of the groups that was to be relocated from Bethlehem to the Sparrows Point business unit was the Tin Mill Products Marketing Group. Tr. 11/20/96 at 8 (Kesselring). Sparrows Point is the only place where Bethlehem manufactures tin mill product. *Id.* (Kesselring).

25. In the Fall of 1992, Bethlehem maintained separate Product Marketing Groups for (a) Hot/Cold Rolled Sheet Products, (b) Coated Sheet Products, (c) Tin Mill Products; and (d) Plate Products. Under Bethlehem's organizational structure, these Product Marketing Groups were in the Marketing Division of Bethlehem's Commercial Department. *Stipulation 29.* Each of these Product Marketing Groups was affected by the recom-

mendation of the Com–Ops Team as adopted by Bethlehem's Senior Management. *Stipulation 28.* Pursuant to the recommendation of the Com–Ops Team, the Product Marketing Groups for Hot/Cold Rolled Sheet Products, Coated Sheet Products and Plate Products were divided between the Burns Harbor Division and the Sparrows Point Division because those Products were manufactured at each facility. The employees in the Product Marketing Groups for Hot/Cold Rolled Products, Coated Sheet Products and Plate Products were to be transferred to either the Burns Harbor facility or the Sparrows Point facility. There was to be no product marketing function left in Bethlehem, Pennsylvania. *Stipulation 30.* As of 1992, Bethlehem manufactured Tin Mill products only at its Sparrows Point facility. The adoption by Senior Management of the Com–Ops Team's recommendations meant that the Tin Mill Products Group would be transferred to the Sparrows Point facility. *Stipulation 31.*

26. In 1992, the Tin Mill Product Marketing Group in Bethlehem, Pennsylvania was a unique group within Bethlehem. The Tin Mill Product Customer Service Representatives were the primary contact between Bethlehem and its tin mill product customers. *Stipulation 47.* They had responsibility for working out the customers' problems and handling their claims and orders. Each Customer Service Representative had customers that were assigned to him or her personally. They were responsible for developing close relationships with their customers in order to learn what their needs were and how Bethlehem could meet those needs. *Stipulations 49.* Tin Mill Product Customer Service Representatives sometimes visited with their larger customers to work on those relationships. Through those visits, each of the Plaintiffs had gotten to know the needs and requirements of particular customers. *Stipulation 50; Stipulation 44;* Tr. 11/20/96 at 96–98 (Gulini); Defendants' Exhibit 45, Plaintiff Stout's Deposition Designations, at 2–13; Defendants' Exhibit 46, Plaintiff Debus' Deposition Designations, at 18–20; Defendants' Exhibit 47, Plaintiff Hedden's Deposition Designations, at 8–14.

27. Part of Bethlehem's reason in 1983 for centralizing Tin Mill product sales and marketing in one group of dedicated employees was to develop those employees' expertise in the Tin Mill product area. *Stipulation 45.* Some customers only buy Tin Mill product from Bethlehem. *Stipulation 46.* Approximately 80% of Bethlehem's Tin Mill products are purchased by approximately 20% of Bethlehem's Tin Mill product customers. *Stipulation 48.*

28. Because of: (1) the expertise possessed by the incumbent Customer Service Representatives in regard to their job functions; and (2) Bethlehem's desire to assure a transition that involved no disruption to its customers or to their perception of Bethlehem's service, Bethlehem wanted all of the incumbent Tin Mill Products Group Customer Service Representatives to relocate to the Sparrows Point facility. *Stipulation 51.* Plaintiffs had the training, knowledge, skill and expertise to perform the jobs at Sparrows Point. Defendants' Exhibit 45, Plaintiff Stout's Deposition Designations, at 28, 49–50. Bethlehem offered the Plaintiffs jobs at Sparrows Point because Bethlehem wanted good employees that had experience and expertise in tin mill product. Defendants' Exhibit 46, Plaintiff Debus' Deposition Designation, at 27. The testimony of Tin Mill Products General Manager Tucker, Tin Mill Products Manager Silagyi and Commercial Vice–President Post also confirms that Bethlehem offered employment to the Plaintiffs at the Sparrows Point Division because Bethlehem wanted to maintain the continuity of the relationships developed by Plaintiffs with their customers, to make the transition as seamless to the customers as possible, and to preserve the training, skill, knowledge and expertise of the Plaintiffs. Plaintiffs' Exhibit 32, Tucker Deposition at 86–87; Defendants' Exhibit 49, Post Deposition at 20–21, 27–28; Defendants' Exhibit 50, Silagyi Deposition at 32–34. In short, Bethlehem made the job offers to the Plaintiffs because it wanted them to relocate with the Tin Mill Product Marketing Group to Sparrows Point and continue performing the same work that they had been doing for the past 10 years or so, not because Bethlehem wanted to deny pensions to the Plaintiffs.

Defendants' Exhibit 48, Gulini Deposition Designation, at 50–52.

29. The relocation of the Product Marketing Groups to the business units was a major employment action that affected a number of employees. Tr. 11/19/96 at 105 (Dopera); Plaintiffs' Exhibit 31, Post Deposition at 30. Bethlehem's practice in connection with major employment actions, such as the relocation of the Product Marketing Groups, is to assemble its in-house personnel who are responsible for personnel and benefits matters to determine the benefits and personnel implications of the employment action. Tr. 11/20/96 at 8–9 (Kesselring). One purpose of such meetings is to permit the Plan Administrator to have input to ensure that the employment action is being treated appropriately. (Tr. 4/16/96 at 45 (Dopera)). Another purpose is to prepare a communications package, to be distributed to affected employees, that describes the employment action and the employee benefits available or affected by the action. Tr. 11/19/96 at 102–04 (Dopera). The Plan Administrator participates in these meetings to ensure that the Company is being consistent with past policies and following the applicable rules and regulations with respect to pension benefit matters, that the employees are properly informed and that the benefit descriptions are accurate as far as the benefits provided. Tr. 4/16/96 at 45–47; Tr. 11/19/96 at 105–06 (Dopera).

30. In late 1992, after Bethlehem's Senior Management had adopted the recommendations of the Com–Ops Team, representatives from Bethlehem's Personnel and Benefits Divisions and from its Law and Commercial Departments prepared a packet of informational materials, entitled "Product Marketing Transfer" for distribution to employees in the Product Marketing Groups. *Stipulation 32;* Def. Exh. 16. Bethlehem expected as part of the move that all exempt salaried employees in the Product Marketing Groups would be offered employment at one of the business units. *Stipulation 33.* A Transition Team was established in early 1993 to implement the adopted recommendations of the Com–Ops Team. *Stipulation 35.*

31. Consistent with Bethlehem's practice, Mr. Leonard C. Kesselring, Bethlehem's Manager of Personnel, met with Mr. Dopera and Bethlehem's ERISA counsel, John Hand, Esquire, on December 15, 1992, and with Kathleen M. Mills, Esquire, a Bethlehem Steel attorney who works on personnel matters, on December 16, 1992. Tr. 11/20/96 at 9 (Kesselring). Prior to these meetings, Mr. Kesselring had met with Mr. Post and learned of the plan to relocate the Product Marketing Groups to the business units and the details of that relocation. Tr. 11/19/96 at 204–06; Tr. 11/20/96 at 8 (Kesselring). In the course of those meetings, a number of decisions relating to the personnel and benefit implications of the impending relocations of the product marketing groups were made, including the decision by Mr. Kesselring that the proposed action was a relocation of function rather than a shutdown or a partial shutdown. Tr. 11/19/96 at 60–61, 177 (Dopera, Kesselring). This decision was based on the fact, which was known at the time of the December meetings, that the existing positions within the Product Marketing Groups were to be transferred to the business units, so that 20% of the positions within those Groups were *not* being eliminated as part of the relocation. Tr. 11/20/96 at 9–11 (Kesselring). Another decision made initially at the December 1992 meetings was that the jobs that were to be offered to the product marketing employees at Burns Harbor and Sparrows Point would be considered suitable long-term employment. Tr. 11/19/96 at 104–05 (Dopera); Tr. 11/20/96 at 11 (Kesselring); *Stipulation 34.* This decision was based on the fact, which was known at the time of the December meetings, that the positions at the business units would be essentially the same positions as the positions held by the product marketing employees in Bethlehem. Tr. 11/19/96 at 105 (Dopera).

32. In determining whether a particular employment action constitutes a shutdown, Bethlehem has a policy of declaring an employment action to be a shutdown (or partial shutdown) if 20% or more of the positions in the affected unit are eliminated by the action. Tr. 11/19/96 at 89 (Dopera); Tr. 11/20/96 at 10 (Kesselring). This policy is a long-standing one with respect to salaried employees.

Tr. 11/19/96 at 137 (Dopera). If a participant under the Salaried Plan, in making a claim for benefits, disagrees with decision by Bethlehem on whether the particular employment action constitutes a shutdown or relocation, the Plan Administrator will review Bethlehem's decision, to ensure that it is consistent with past policies and practices. Tr. 4/16/96 at 45–46 (Dopera).

33. The employment action in 1993 with respect to the Product Marketing Groups, including the Tin Mill Product Marketing Group where Plaintiffs were employed, did not involve the elimination of 20% or more of the positions in those Groups. Tr. 11/19/96 at 89 (Dopera). In connection with that action, only one position—the position of Scheduling Supervisor in the Plates Product Marketing Group—was eliminated. Tr. 11/19/96 at 181–83 (Kesselring). Accordingly, the employment action was not shutdown or a partial shutdown under Bethlehem's established policy. Tr. 11/19/96 at 89 (Dopera); Tr. 11/19/96 at 177 (Kesselring); Tr. 11/20/96 at 9–10 (Kesselring). The transfer of the Product Marketing Groups, including the Tin Mill Product Marketing Group, to the business units was a relocation of function. Tr. 4/16/96 at 44–45 (Dopera); Tr. 11/20/96 at 10–11 (Kesselring).

34. Bethlehem's usual practice is to assemble and distribute communication packages to the employees who will be affected by a major employment action, in order to provide them with accurate information about the personnel and benefit aspects of the employment action. Tr. 4/16/96 at 44–45 (Dopera); Tr. 11/19/96 at 102–03 (Dopera); Tr. 11/20/96 at 13 (Kesselring). In Bethlehem's experience, a myriad of questions arises with respect to such employment actions. Tr. 11/20/96 at 13 (Kesselring).

35. Consistent with Bethlehem's practice, a communications package was prepared with the input of Mr. Dopera, in his capacity as Plan Administrator, and the input of Bethlehem's Personnel Department. Tr. 11/19/96 at 102–06 (Dopera). Bethlehem's purpose in putting together the package was to permit the affected individuals to plan as well as possible for their families, so that they could make informed decisions as to whether or not to accept the transfer offers. Tr. 11/19/96 at 103 (Dopera); Tr. 11/20/96 at 14–15 (Kesselring). Mr. Dopera specifically inserted into the communications package (Defendants' Exhibit 16) a statement that "No employee will be eligible for Rule–of–65 pension because they are being offered suitable long-term employment." He did this so that the consequences of the relocation of function would be clear to the employees. Tr. 11/19/96 at 104–05 (Dopera).

36. On January 19, 1993, at a meeting in Bethlehem's Grace Auditorium in Bethlehem, employees in the various Product Marketing Groups, were notified of the relocation of the product marketing functions to the newly formed business units at Burns Harbor and Sparrows Point. Representatives from the Commercial, Personnel and Benefits Groups conducted this meeting. *Stipulation 37; Stipulation 58*. At the meeting on January 19, 1993, Bethlehem distributed to the employees the communications package entitled "Product Marketing Transfer," which is marked as Defendants' Exhibit 16. Tr. 11/20/96 at 15 (Kesselring). The memorandum on the Sparrows Point Relocation Package that is marked as Defendants' Exhibit 17 was distributed sometime later. *Stipulation 38*. Each Plaintiff specifically received the communications package. *Stipulation 59*.

37. The relocation package that was offered to each of the Plaintiffs would cost the corporation between $65,000 and $70,000 plus an additional cash incentive payment for this particular relocation per employee. Tr. 11/20/96 at 20–21 (Kesselring); *Stipulation 52*. The relocation package is summarized in Defendants' Exhibit 17. *Stipulation 36*; Def. Exh. 17. Each of the Plaintiffs was offered a 10% salary increase, to commence June 1, 1993, in conjunction with the relocation. *Stipulation 53*. In addition, the relocation package offered individuals who were transferred to Sparrows Point financial help in selling their homes, assistance in buying new homes, closing costs and moving expenses, four months temporary living expenses and a "tax gross-up" associated with these expenses. A separate cash incentive of up to $12,000 was also offered to those employees who actually moved to apartments in

Maryland or purchased homes in Maryland. Tr. 11/20/96 at 18–20 (Kesselring); Defendants' Exhibit 17.

38. The Tin Mill Products Group was to be relocated only to Sparrows Point. *Stipulation 43.* Tin Mill products are currently produced by Bethlehem only at its Sparrows Point Division. *Stipulation 42.*

39. Fifty-seven product marketing employees in Bethlehem, Pennsylvania were affected by the relocation of function. Of those 57 employees, 51 of them received offers of employment at the Sparrows Point or Burns Harbor business unit. Defendants' Exhibit 34 is a chart that reflects the names of the individuals in the product marketing area who were affected by the relocation of function. This creates a little less than 10% specific job elimination. Of the 6 individuals who did not receive offers of employment at the business units, 5 were clerical employees who were salaried non-exempt employees. Three of the clerical employees were secretaries and two were administrative clerks. Bethlehem made a business decision not to make transfer offers to those clerical employees because the skills required by their positions (secretary or administrative clerk) were available at the new locations (that is, Burns Harbor and Sparrows Point), and it would have cost the corporation between $65,000 and $70,000 to transfer each individual. Defendants' Exhibit 34; Tr. 11/20/96 at 20–21, 25–29 (Kesselring). The only other employee who did not receive a transfer offer was Fred Stebbins. Kesselring testified that Stebbins was not given an offer because his position was being eliminated and there was no work for him to do at Burns Harbor or Sparrows Point. Tr. 11/19/96 at 181–182 (Kesselring). Stebbins was not a coordinator or customer service representative as were most of the other salaried exempt employees in the Product Marketing Groups; he was a Scheduling Supervisor. Plaintiffs' Exhibits 10 and 11. Stebbins' job was eliminated as part of the relocation because the scheduling function was to be performed by other persons already employed at the business units. Tr. 11/19/96 at 182–83 (Kesselring).

40. Each of the Plaintiffs was offered a job at Bethlehem's Sparrows Point Division that was essentially the same as the job he or she was then performing in Bethlehem, Pennsylvania. Defendants' Exhibit 32. Each Plaintiff was physically qualified to perform the job offered at the Sparrows Point Division. *Stipulation 54.* Each Plaintiff had the ability and skills required to perform the job offered at the Sparrows Point Division. *Stipulation 55.* The jobs were not temporary jobs; they were regular, full-time, salaried exempt jobs. *Stipulation 57.* While Sparrows point is outside the geographical area of Bethlehem, each plaintiff would be paid 110% of their original salary. Tr. 11/20/96 at 21–22 (Kesselring). Therefore, the job offers were offers of suitable long-term employment as defined in the Salaried Plan's SLTE Rules, and each of the Plaintiffs stated that the job offer that he or she received fell within the definition of suitable long-term employment as set forth in the Summary Plan Description. Tr. 11/20/96 at 102–03 (Gulini), 146 (Debus), 176–79 (Stout), 199–200 (Hedden); Defendants' Exhibit 45, Plaintiff Stout's Deposition Designations, at 38–39; Defendants' Exhibit 47, Plaintiff Hedden's Deposition Designations at 32–36. The Plaintiffs were not treated any differently from the other salaried exempt employees affected by the 1993 relocation of the Product Marketing Groups. Tr. 11/20/96 at 22 (Kesselring).

41. Plaintiffs have stated that they believe that whether a job offer is an offer of SLTE should be dependant on the individual circumstances of each employee; that the term "suitable" invites determination by the employee. Plaintiff Stout's Deposition Designation at 44–45; Plaintiff Debus's Deposition Designation at 6–7; Plaintiff Gulini's Deposition Designation at 54–55.

42. At least through November, 1995 (when discovery on Count 1 in this case ended), the employees from the Tin Mill Products Group who accepted the offers and relocated to the Sparrows Point Division and the employees who filled the positions offered to the Plaintiffs continued to be employed by Bethlehem as regular, full time employees at the Sparrows Point facility. *Stipulation 56.*

43. Each of the Plaintiffs declined the job offered to him or her by Bethlehem. Tr. 11/20/96 at 81 (Gulini), 140 (Debus), 166(Stout), 192 (Hedden). The jobs offered to Plaintiffs were filled by other persons who became Coordinators in the Tin Mill Products Group at the Sparrows Point Division. Tr. 11/19/96 at 201; Tr. 11/20/96 at 23 (Kesselring). Those jobs still exist today Tr. 11/20/96 at 23 (Kesselring), and the duties of those jobs today are, in the words of Tin Mill Products General Manager Tucker, "virtually identical" to the duties being performed in 1992 by Plaintiff in Bethlehem. Plaintiffs' Exhibit 32, Tucker Deposition at 87–88. After their initial declinations of the job offers, none of the Plaintiffs ever indicated to Bethlehem that he or she had changed his or her mind. Tr. 11/20/96 at 25 (Kesselring). The reasons stated by each Plaintiff at trial for declining the offered jobs in April, 1993 continued to exist and were just as powerful for each Plaintiff after Plaintiffs were laid off on October 31, 1993. Tr. 11/20/96 at 110 (Gulini), 149–50 (Debus), 185–86 (Stout), 201–02 (Hedden). No Plaintiff testified that if he or she had been reoffered a job at the Sparrows Point Division after October 31, 1993, he or she would have taken the job and transferred to Sparrows Point.

*The Initial Efforts to Obtain Rule–of–65 Information and Benefits*

44. The Plaintiffs, after they received the communications package distributed at the January 19, 1993 meeting, made repeated complaints about the decision that the Rule–of–65 Retirement would not be available in connection with the relocation of the Product Marketing Groups. They made persistent efforts to obtain information about the Rule–of–65 Retirement with the final goal of actually obtaining the benefits for themselves. Tr. 11/20/96 at 78–90 (Gulini); 128–139 (Debus); 163–173 (Stout); 190–196 (Hedden).

45. On January 25, 1993, Plaintiff Mary Stout wrote a letter to Mr. Curtis Barnette, the Chairman of the Board of Directors of Bethlehem in which she asked him "to reconsider your Rule–of–65 decision." *Stipulation 60;* Def. Exh. 18. Mr. Barnette responded in writing to Ms. Stout on January 26, 1993. *Stipulation 61;* Def. Exh. 19. In February,

1993, Ms. Stout spoke to Ray French, an employee in Bethlehem's Benefits Division. During that conversation, among other things, Ms. Stout asked Mr. French why Bethlehem was, in her view, discriminating as to the eligibility for Rule–of–65 Retirement. *Stipulation 66.* Mr. French responded to Ms. Stout in writing on or about February 12, 1993. *Stipulation 67;* Def. Exh. 22. Ms. Stout also met with Mr. Silagyi and during that meeting asked that Bethlehem change the decision with regard to Rule–of–65 pension rights. (Tr. 11/20/96 at 180 (Stout)). As Ms. Stout put it, "I probably asked everybody I ever walked by." (*Id.* at 181 (Stout)).

46. On January 29, 1993, Edward H. Smith, Jr., a Customer Service Supervisor in the Tin Mill Products Group, also wrote a letter to Mr. Barnette. *Stipulation 62;* Def. Exh. 20. Mr. Barnette responded in writing to Mr. Smith on January 29, 1993. *Stipulation 63;* Def. Exh. 21.

47. At January 1993 meeting between Mr. Gulini and Mr. Silagyi of Bethlehem, Mr. Gulini expressed concern about not getting a Rule–of–65 Retirement. Tr. 11/20/96 at 104 (Gulini). In February, 1993, Bethlehem held separate meetings for employees in each of the four Product Marketing Groups affected by the relocation. Defendants' Exhibit 23 is a genuine and authentic copy of a memorandum dated February 4, 1993 from Dave Post to Larry Blake, Bob Carle, Dave Roberts and Pete Tucker regarding these meetings. *Stipulation 68.* The purpose of these meetings was "to further [Bethlehem's] communication with these employees, reiterate [Bethlehem's] strong need for their work and contribution to our success, develop a better understanding of the Rule of 65 and discuss any questions/issues/concerns that they may have." The meetings were conducted by David Post, who was the Senior Vice President for Commercial, Leonard Kesselring, Bethlehem's Manager of Personnel, and Maureen Dresen, who was Bethlehem's Director of Benefit Services. *Stipulation 64.* The meeting for the Tin Mill Products Group was held on February 9, 1993. Plaintiffs Stout, Hedden and Debus attended that meeting. Plaintiff

Gulini attended the meeting for the Plates Product Marketing Group, which was on February 12, 1993, because he was on vacation on the day of the meeting for the Tin Mill Products Group. *Stipulation 65.* At the February 12, 1993 meeting, Mr. Gulini again expressed concern about the Rule–of–65 Retirement and told the people at the meeting that he felt that he ought to be eligible. Tr. 11/20/96 at 91, 104 (Gulini).

48. On March 16, 1993, Plaintiffs Stout and Gulini wrote a letter to Michael Dopera, Manager of Employee Benefits. *Stipulation 69;* Def. Exh. 24. By letter dated March 24, 1993, E.R. French, Assistant Secretary, General Pension Board, responded to the March 16, 1993 letter from Plaintiffs Stout and Gulini to Mr. Dopera. *Stipulation 71;* Def. Exh. 25.

49. On or about April 15, 1993, Plaintiff Stout sent a memorandum to Mr. Post. *Stipulation 72;* Def. Exh. 26. On or about April 29, 1993, Mr. Leonard Kesselring, Bethlehem's Manager of Personnel, sent a memorandum to Plaintiff Stout. This memorandum responded to the April 15, 1993 memorandum sent by Ms. Stout to Mr. Post. *Stipulation 74;* Def. Exh. 28. On or about April 16, 1993, Plaintiff Gulini sent a memorandum to Mr. Post. *Stipulation 73;* Def. Exh. 27. On or about April 29, 1993, Mr. Kesselring sent a memorandum to Plaintiff Gulini. This memorandum responded to Mr. Gulini's April 16, 1993 memorandum to Mr. Post. *Stipulation 75;* Def. Exh. 29.

*The Official Offer and Rejection*

50. On or about April 22, 1993, Peter Tucker, the Tin Mill Products Group General Manager, met separately with each of the Plaintiffs. In each meeting, Tucker orally made to each Plaintiff Bethlehem's offer of employment at the Sparrows Point facility and outlined the terms of the offer. *Stipulation 84.* At the April 22 meeting with Plaintiff Stout, Tucker told Stout that as part of the offer she would be reclassified to a Position Level 23 position and that her annual salary would be increased by 10% to $33,511. At the time, Stout's position was a Position Level 22, and her annual salary was $30,396. Tucker told Stout that the reclassification to a Position Level 23 and the increase in salary would become effective June 1, 1993 if she agreed to accept the offer and relocate to the Sparrows Point facility. Tucker requested a response from Plaintiff Stout by April 29, 1993. *Stipulation 85.* At the April 22 meeting with Plaintiff Hedden, Tucker told Hedden that as part of the offer he would be reclassified to a Position Level 23 position and that his annual salary would be increased by 10% to $33,766. At the time, Hedden's position was a Position Level 22, and his annual salary was $30,696. Tucker told Hedden that the reclassification to a Position Level 23 and the increase in salary would become effective June 1, 1993 if he agreed to accept the offer and relocate to the Sparrows Point facility. Tucker requested a response from Plaintiff Hedden by April 29, 1993. *Stipulation 87.* At the April 22 meeting with Plaintiff Gulini, Tucker told Gulini that as part of the offer he would be reclassified to a Position Level 23 position and that his annual salary would be increased by 10% to $36,894. At the time, Gulini's position was a Position Level 22, and his annual salary was $33,540. Tucker told Plaintiff Gulini that the reclassification to a Position Level 23 and the increase in salary would become effective June 1, 1993 if he agreed to accept the offer and relocate to the Sparrows Point facility. Tucker requested a response from Plaintiff Gulini by April 29, 1993. *Stipulation 89.* At the April 22 meeting with Plaintiff Debus, Tucker told Debus that as part of the offer he would be reclassified to a Position Level 23 position and that his annual salary would be increased by 10% to $36,885. At the time, Debus' position was a Position Level 22, and his annual salary was $33,456. Tucker told Debus that the reclassification to a Position Level 23 and the increase in salary would become effective June 1, 1993 if he agreed to accept the offer and relocate to the Sparrows Point facility. Tucker requested a response from Plaintiff Debus by April 29, 1993. *Stipulation 91.* No non-exempt salaried employee, including the clerical employees in the Tin Mill Products Group, was offered a transfer to either of the business units. *Stipulation 95.*

51. On April 29, 1993, all four plaintiffs told Tucker that they rejected the offer of

employment at the Sparrows Point facility. *Stipulation 86; Stipulation 88; Stipulation 90; Stipulation 92.* Tucker sent Leonard Kesselring a memorandum on April 30, 1993 which stated that plaintiffs had indicated to him that they would not relocate to Sparrow's Point. *Stipulation 94;* Def. Exh. 33.

52. Despite his earlier statement, Tucker sent letters dated April 29, 1993 to all Plaintiffs containing a written offer of employment at Sparrows Point as Coordinators which extended the deadline to respond as to their intentions to May 7, 1993. *Stipulation 93, Stipulation 115;* Def. Exh. 32.

53. Each Plaintiff was advised that he or she could change his or her mind about the offer of employment at the Sparrows Point facility and accept it at any time until June 1, 1993. *Stipulation 96.* None of the Plaintiffs subsequently advised Bethlehem's management, at any time, that he or she was willing to accept the offer of employment at the Sparrows Point facility. *Stipulation 97.*

54. Each Plaintiff stated in their individual meetings with Mr. Silagyi that they had no intentions of moving to Sparrows Point, Maryland regardless of whether they received a Rule–of–65 Pension. (Plaintiff Stout's Deposition Designation at 30; Plaintiff Debus's Deposition Designation at 21–22; Plaintiff Hedden's Deposition Designation at 35; Plaintiff Gulini's Deposition Designation at 41, 42).

*The First Application*

55. On or about April 21, 1993, all four Plaintiffs and others sent a memorandum to Mr. Post relating to the Rule–of–65 Retirement benefit. *Stipulation 76;* Def. Exh. 30. Mr. Post is the head of Bethlehem's Commercial Department. He is the Senior Vice President for the Commercial Department. *Stipulation 77.* The letter stated that its subject was "Rule–of–65 Pension Entitlement." In the letter, the Plaintiffs sought access to the dispute resolution procedure contained in the 1990 Pension Agreement between Bethlehem and the United Steelworkers for hourly represented employees to have an arbitrator determine whether the offered employment at the Sparrows Point Division constituted SLTE. Mr. Gulini stated that in sending the April 21, 1993 letter, he

wanted a Rule–of–65 Retirement. Tr. 11/20/96 at 106 (Gulini). Mr. Debus felt that he was entitled to a Rule–of–65 Retirement, deserved it and was not getting it, and wanted Mr. Post to become involved to secure a Rule–of–65 Retirement for him. *Id.* at 146–47 (Debus). Ms. Stout stated that when she sent the letter she was trying to obtain a Rule–of–65 Retirement as part of the resolution sought in the letter. *Id.* at 183 (Stout); Defendants' Exhibit 45, Plaintiff Stout's Deposition Designation, at 55. At this time, all of the Plaintiffs had consulted an attorney. *Id.* at 56; Defendants' Exhibit 30; Defendants' Exhibit 46, Plaintiff Debus' Deposition Designation, at 40; Defendants' Exhibit 45, Plaintiff Stout's Deposition Designation, at 56. Plaintiffs began consulting an attorney in early February, 1993. Defendants' Exhibit 48, Plaintiff Gulini Deposition Designation, at 57–58.

56. After receiving the April 21, 1993 memorandum, Mr. Post sent the memorandum to Leonard Kesselring with copies to Jack Jordan, Bethlehem's Senior Vice President of Administration and Human Resources, and to Ben Boylston, Bethlehem's Vice President of Human Resources. Mr. Post stated that he did this because he has no responsibility for the administration or interpretation of any of the benefit plans, and therefore had no authority to arbitrate the issue of SLTE as Plaintiff had requested in the April 21, 1993 letter. Defendants' Exhibit 49, Post Deposition at 80–82, Tr. 11/19/96 at 111 (Dopera). Mr. Kesselring reported to Mr. Boylston, who, in turn, reported to Mr. Jordan. In sending the April 21 memorandum to Mr. Kesselring, Mr. Post wrote the following note: "Len, yours to handle. I gave cc's to JAJ & BCB." Mr. Post also added in handwriting a postscript: "JAJ told me to 'worry not' about this." Mr. Post testified that this postscript meant that Mr. Jordan "was saying that I [Mr. Post] did not need to personally worry or be involved and that I should send it to human resources, which is what I did." *Stipulation 78.* On April 26, 1993, Mr. French sent a copy of the April 21, 1993 memorandum to Mr. Kesselring and Mr. Kesselring's assistant, Mr. James Sinwell, with a handwritten note stat-

ing as follows: "Please be aware of the attached and advise your counselors to be circumspect in their discussions with Product Marketing employees. We will send you a copy of our response." *Stipulation 79;* Pl. Exh. 20.

57. On April 26, 1993, Mr. Post sent a memorandum, marked "Confidential," to Larry Blake, Bob Carle, Dan Land, Dave Roberts and Pete Tucker forwarding to them a copy of the April 21, 1993 memorandum from the Product Marketing employees to Mr. Post. The recipients of Mr. Post's April 26 memorandum were all members of Bethlehem's management who had various responsibilities related to for the relocation of the Product Marketing Groups to the Business Units. *Stipulation 80;* Pl. Exh. 19. On May 6, 1993, Mr. French sent a memorandum, marked "Personal & Confidential" to Messrs. Post, Boylston, Kesselring and J.T. Hand, an ERISA attorney in Bethlehem's Law Department, and to Mrs. Mills, also an attorney in Bethlehem's Law Department providing for their "information an example of the responses sent to the following Product Marketing employees who requested Rule–of–65 pension entitlement in the letter to D. Post." *Stipulation 81;* Pl. Exh. 25.

58. Paragraph 3.9 of the Salaried Plan sets forth the application procedure for retirement benefits. *Stipulation 14.* However, Mr. Dopera testified that Bethlehem's practice is to treat inquiries like the April 21, 1993 letter as claims for benefits regardless of form, with the rule being, when in doubt, treat the inquiry as a claim. *Id.* at 58–59 (Dopera). When Mr. Dopera received the April 21, 1996 letter, he knew that the Plaintiffs were disputing the decision that the job offered employment at the Sparrows Point Division would constitute suitable long-term employment, and he understood the letter as being a benefits claim. Tr. 11/19/96 at 110 (Dopera). At that time, he also understood that the Plaintiffs had retained an attorney to assist them. *Id.* (Dopera). He further understood that the Plaintiffs were attempting to invoke procedures that were in place to resolve disputes about benefits. *Id.* (Dopera). Neither Mr. Dopera as the Plan Administrator nor the General Pension Board

had authority to agree to arbitrate the issue of SLTE as requested by Plaintiffs in their April 21, 1993 letter because the Salaried Plan expressly provides in Section 9 for a review process that does not include arbitration. Tr. 11/19/96 at 111 (Dopera).

59. After receiving the April 21, 1996 letter, Mr. Dopera reviewed the relevant information and determined as Plan Administrator that the Plaintiffs had been offered suitable long-term employment and that they were therefore not eligible for the Rule–of–65 Retirement. (Tr. 11/19/96 at 52–53, 88 (Dopera)). In making that decision, he did not contact the Plaintiffs to gather additional information from them because Rule–of–65 Retirement eligibility does not turn on individual circumstances (except for the "physical ability" criterion which was not an issue here as Plaintiffs were already performing the same jobs in Bethlehem). The determination of SLTE looks at the aggregate total situation and does not take into account the particular circumstances of an individual employee. Thus, no additional information was needed, and there was no reason for Mr. Dopera to contact the Plaintiffs. Tr. 11/19/96 at 86–87, 135–36 (Dopera). Mr. Dopera already knew that the Plaintiffs were physically able to do the offered jobs, that they had the skills to do the jobs and that they were to receive a 10% salary increase if they accepted the offered jobs. *Id.* (Dopera). Accordingly, Mr. Dopera had sufficient information to determine that the jobs offered to Plaintiffs at the Sparrows Point Division met the criteria set forth in the SLTE Rules and that the offered employment constituted SLTE under Paragraph 2.7 of the Plan. Tr. 11/19/96 at 88, 136 (Dopera).

60. On May 6, 1993, Mr. Dopera, as Plan Administrator and Secretary of the General Pension Board, responded to the April 21, 1993 memorandum submitted by nine Product Marketing employees, including the four Plaintiffs, to Mr. Post regarding Rule–of–65 Retirement Benefits. Def. Exh. 31. In his May 6, 1993 letter, Mr. Dopera informed each Plaintiff, among other things, that "the positions offered at both Burns Harbor and Sparrows Point would be considered suitable

log-term employment." and stated his "determination as Plan Administrator of the Plan that you are not eligible for a Rule–of–65 Retirement." Mr. Dopera also informed each Plaintiff, that, "[i]f you disagree with the above determination, you may request a review of the matter by the General Pension Board, as set forth on page 29" in the Summary Plan Description marked as Defendants' Exhibit 3. Def. Exh. 31. Each of the other three (3) Plaintiffs received an identical letter, also dated May 6, 1993, from Mr. Dopera as the Plan Administrator. *Stipulation 82.*

61. Mr. Dopera stated that he wanted to make clear to the participants by his letter that if they did not accept the offer of employment at Sparrows Point, they would not be eligible for the Rule–of–65 Retirement. Tr. 11/19/96 at 55 (Dopera). Mr. Dopera's determination did not affect the Plaintiffs' right to deferred vested pensions when they reach normal retirement age. Tr. 11/19/96 at 112 (Dopera).

62. None of the Plaintiffs appealed Mr. Dopera's determination to the General Pension Board. *Stipulation 83.* Tr. 11/20/96 at 137, 196 (Debus, Hedden); Defendants' Exhibit 45, Plaintiff Stout's Deposition Designation, at 58–59; Defendants' Exhibit 46, Plaintiff Debus' Deposition Designation, at 36; Defendants' Exhibit 48, Plaintiff Gulini's Deposition Designation, at 62; and Defendants' Exhibit 47, Plaintiff Hedden's Deposition Designation, at 42–43. Plaintiffs were not able to offer any explanation as to why they did not ask the General Pension Board to review the determination by Mr. Dopera as Plan Administrator. Defendants' Exhibit 45, Plaintiff Stout's Deposition Designation, at 58–60; Defendants' Exhibit 46, Plaintiff Debus' Deposition Designation, at 36–40; and Defendants' Exhibit 48, Plaintiff Gulini's Deposition Designation, at 58–59, 61–63.

*The Second Application*

63. On October 31, 1993, each of the Plaintiffs was laid off. *Stipulation 99.* After November 1, 1993, the Product Marketing Groups, including the Tin Mill Products Group, were no longer located in Bethlehem, Pennsylvania, and those Groups were performing their functions at the business units (the Burns Harbor and Sparrows Point Divisions). *Stipulation 98.*

64. While on layoff, the Plaintiffs continued to accrue service and to receive, at Bethlehem's expense, life insurance and health care benefits under plans sponsored by Bethlehem for a period of time depending on the employee's years of service with Bethlehem. *Stipulation 100.* In this case, each of the Plaintiffs was entitled to receive life insurance and health care benefits, at Bethlehem's expense, for a period of twelve months while on layoff status. Plaintiffs did not have to pay anything for these benefits. *Stipulation 101.*

65. Following their layoffs in October of 1993, no subsequent offer of employment was made to any of the Plaintiffs by Bethlehem. *Stipulation 102.* On October 31, 1995 the accrual of continuous service ended for each of the Plaintiffs. *Stipulation 103.*

66. In November, 1995, each of the Plaintiffs wrote to the Plan Administrator and requested an application for a Rule–of–65 Retirement benefit. *Stipulation 104;* Def. Exh. 35. On or about November 30, 1995, Mr. Dopera responded to the Plaintiffs, sending each of them an application for a pension under the Plan. *Stipulation 105;* Def. Exh. 36.

67. In December 1995, each of the Plaintiffs submitted a pension application to Mr. Dopera in his capacity as Plan Administrator. *Stipulation 106;* Def. Exh. 37. None of the Plaintiffs submitted to Mr. Dopera any additional information as to why the Sparrows Point offers did not constitute suitable long-term employment. Tr. 11/20/96 at 106–107 (Gulini), 148 (Debus), 183–184 (Stout), 201 (Hedden).

68. On or about March 12, 1996, the Plan Administrator issued his determinations that none of the Plaintiffs was eligible for a Rule–of–65 Retirement benefit. *Stipulation 107;* Def. Exh. 38. Mr. Dopera based his determination that Plaintiffs are not eligible for Rule–of–65 Retirements on the fact that Bethlehem had offered them employment at the Sparrows Point Plant in connection with the relocation of the Product Marketing Groups, that the offered employment consti-

tuted SLTE, and that a Rule-of-65 Retirement is only available to an otherwise eligible employee who has not received an offer of SLTE. *See* Def. Exh. 38; Tr. 11/19/96 at 52–53; 123–24 (Dopera). Mr. Dopera explained at trial that offers of SLTE are valid even if they are timed before the actual layoff; the SLTE must only be made in connection with a particular major employment event. Tr. 11/19/96 at 124–126 (Dopera). Plaintiffs were offered suitable long-term employment in connection with the relocation of the Product Marketing Groups, and they declined that employment; it was this that disqualified them from Rule-of-65 Retirement benefits. Tr. 11/19/96 at 88 (Dopera).

69. Mr. Dopera stated at trial that he has considered the issue of the timing of an SLTE as relates to a employment event and that typically Bethlehem likes to tell employees of the SLTE prior to the end of their current job so that they can be informed, and have time to plan and get their affairs in order. Tr. 11/19/96 at 125–126 (Dopera). He further stated that while none of the plan documents currently discuss the proper timing of an SLTE, he felt comfortable with this long standing interpretation because he had read two recent federal cases supporting that view. Tr. 11/19/96 at 134 (Dopera). We find these statements credible.

70. Mr. Dopera's letter further advised each of the Plaintiffs of his or her appeal rights to the Employee Benefits Administration Committee and invited each of them to include with his or her request for review "any information which you believe is relevant to your case." Def. Exh. 38.

71. On or about May 15, 1996, each of the Plaintiffs, through counsel, appealed the March 12, 1996 determinations of the Plan Administrator to the Employee Benefits Administration Committee (the "Benefits Committee"). *Stipulation 108;* Def. Exh. 39. Consistent with its policies, the Employee Benefits Administration Committee did not invite the Plaintiffs' attorney to appear before it. Tr. 11/19/96 at 29 (Dopera). This policy was known to the Plaintiffs at the time that they submitted their appeal to the Employee Benefits Administration Committee, because Mr. Dopera had testified to it at trial

in this case on April 16, 1996. Tr. 4/16/96 at 24 (Dopera).

72. Defendants' Exhibit 42 is the package of materials put together by Mr. Dopera for the Employee Benefits Administration Committee in connection with Plaintiffs' appeal to the Employee Benefits Administration Committee from Mr. Dopera's March 12, 1996 determinations. The normal practice with respect to appeals to the Employee Benefits Administration Committee is for Mr. Dopera (or his staff) to assemble and distribute to the Employee Benefits Administration Committee a package of information of materials about the appeal. Tr. 11/19/96 at 127–28 (Dopera). The package for Plaintiffs' appeal contains Mr. Strokoff's letter of May 15, 1996, Defendants' Exhibit 39, which sets forth Plaintiffs' position on the appeal. Tr. 11/19/96 at 128 (Dopera). This package of materials was distributed to the members of the Employee Benefits Administration Committee about a week before the Committee met to consider Plaintiffs' appeal. Tr. 11/19/96 at 127–28 (Dopera).

73. At a meeting held on June 24, 1996, the Benefits Committee considered Plaintiffs' request for review of the determination made with respect to their eligibility for a Rule-of-65 Retirement benefit under the Salaried Plan. Tr. 11/19/96 at 127 (Dopera). The Benefits Committee unanimously adopted the following resolution as to each Plaintiff: "RESOLVED, that, after a full and complete review of the circumstances in the case and the facts as they now exist, no change be made in the determination made by the Secretary of this Committee concerning the eligibility of [name of Plaintiff] for a Rule-of-65 Retirement benefit under the [Salaried] Plan ..., and that Secretary of this Committee is to so advise [the Plaintiff]." Defendants' Exhibit 41 is a genuine and authentic copy of the Minutes of the June 24, 1996 meeting. *Stipulation 109.*

74. Plaintiffs were notified, through their counsel, of the decision of the Benefits Committee by letter dated June 25, 1996. Tr. 11/19/96 at 126–127 (Dopera); *Stipulation 110;* Def. Exh. 40.

75. The denial of Plaintiffs' applications for Rule–of–65 Retirements does not affect the Plaintiffs' right to other forms of retirement under the salaried plan, including normal age retirement. All of the Plaintiffs are eligible for 40/15 deferred vested retirements, which they can begin to receive at age 60 on an actuarially reduced basis or at age 62 on an unreduced basis. *Stipulation 111.*

## III. DISCUSSION

### A. Denial of Benefits

Plaintiffs allege in Count III of their Amended Complaint that Defendants wrongfully denied them their Rule–of–65 Retirement Benefits in violation of 29 U.S.C. § 1132(a)(1)(B). This provision, which permits the recovery of any benefits due, requires us to review the Defendants' decision to deny benefits. To do this, we must first establish the standard of review.

In *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court held that:

a denial of benefits challenged under § 1132(a)(1)(B) [of ERISA] is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.

*Bruch,* 489 U.S. at 115, 109 S.Ct. at 956–57; *Abnathya v. Hoffmann–LaRoche,* 2 F.3d 40, 44 (3d Cir.1993). If the plan provides for such discretionary authority, the decision to deny benefits is to be reviewed under the "arbitrary and capricious" or "abuse of discretion" standard. *Abnathya,* 2 F.3d at 45; *Stoetzner v. United States Steel Corp.,* 897 F.2d 115, 119 (3d Cir.1990). To determine if the plan in question gives the plan administrator discretion, our focus is not on any "magic word" in the plan, but rather is on the "breadth of the administrators' power— their authority to determine eligibility for benefits or to construe the terms of the plan." *Chevron Chemical Company v. Oil, Chemical and Atomic Workers Local Union 4–447,* 47 F.3d 139, 142 (5th Cir.1995)(citing *Wildbur v. ARCO Chem. Co.,* 974 F.2d 631,

637 (5th Cir.), *modified on other grounds,* 979 F.2d 1013 (5th Cir.1992)). However, such discretion must be expressly given, and not implied. *Id.*

In the Plan for the instant case, we found in the above facts that Section 9 deals with the administration of the Plan. Finding of Fact No. 9 ("FOFN"). We found that this section affords both the General Pension Board and the Plan Administrator the power to make and enforce rules for the administration of the plan, the power to grant pensions as the plan provides, and the authority to interpret or construe any ambiguous provision of the Plan. *Id.* As such, we find that the Plan gives the fiduciaries discretionary authority and, ergo, we must review their decisions under an arbitrary and capricious standard. This is consistent with other Courts which have reviewed the same Plan in other cases. *See Hlinka v. Bethlehem Steel Corp.,* 863 F.2d 279, 286 (3d Cir.1988); *Blank v. Bethlehem Steel Corporation,* 758 F.Supp. 697, 701 (M.D.Fla.1990), *aff'd,* 926 F.2d 1090, 1092 (11th Cir.), *cert. denied,* 502 U.S. 938, 112 S.Ct. 372, 116 L.Ed.2d 324 (1991); *Oldakowski v. Bethlehem Steel Corporation,* No. 85–588C, slip op. at 4–5 (W.D.N.Y. January 22, 1987).

Under the arbitrary and capricious standard, we may overturn a decision to deny benefits only if the decision is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Abnathya,* 2 F.3d at 45 (*citing Adamo v. Anchor Hocking Corp.* 720 F.Supp. 491, 500 (W.D.Pa.1989)); *Shiffler v. Equitable Life Assurance Society of the United States,* 838 F.2d 78, 83 (3d Cir.1988) (if show "irrational"); *Pratt v. Petroleum Production Management Employee Savings Plan,* 920 F.2d 651, 657 (10th Cir. 1990) (holding that the decision to deny must be upheld unless it is arbitrary and capricious, not supported by substantial evidence, or erroneous on a question of law). We may not substitute our own judgment for that of the plan administrator, and so long as the decision was rational in light of the plan's provisions, we will uphold it. *See Abnathya,* 2 F.3d at 45; *Moats v. United Mine Workers of America Health & Retirement Funds,* 981 F.2d 685, 688 (3d Cir.1992) (stating that "un-

der the arbitrary and capricious standard the [defendant's] interpretation should be upheld even if the court disagrees with it, so long as the interpretation is rationally related to a valid plan purpose and not contrary to the plain language of the plan."); *Lucash v. Strick Corp.*, 602 F.Supp. 430, 434 (E.D.Pa. 1984), *aff'd*, 760 F.2d 259 (3d Cir.1985).

■ However, as the Supreme Court stated in *Bruch*, "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse in discretion." *Bruch*, 489 U.S. at 115, 109 S.Ct. at 957. Mere "attenuated or hypothetical conflicts of interest do not necessarily invalidate good faith decisions", though. *Flinchbaugh v. Chicago Pneumatic Tool Company*, 531 F.Supp. 110, 114 (W.D.Pa.1982) (*citing Phelan v. Middle States Oil Corp.*, 220 F.2d 593, 604 (2d Cir.), *cert. denied*, 349 U.S. 929, 75 S.Ct. 772, 99 L.Ed. 1260 (1955)).

■ Plaintiffs allege that Defendants were operating under a conflict of interest which would require us to review the decision under a stricter standard. Notwithstanding this allegation, there has been no evidence of conflict apart from the fact that the Plan Administrator and other fiduciaries are employed by the Plaintiffs' employer, Bethlehem Steel Company. ERISA specifically contemplates such an arrangement in 29 U.S.C. 1108(c)(3), which states that "nothing in ... this title shall be construed to prohibit any fiduciary from ... serving as a fiduciary in addition to obeying an officer, employee, agent or other representative of a party in interest." *See Abnathya*, 2 F.3d at 45, n. 5 (stating that the mere fact that an employer acts as the administrator of its own ERISA plan is not significant enough to warrant a heightened standard of review); *Bruch*, 489 U.S. at 111–114, 109 S.Ct. at 954–956; *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 443 (2d Cir.1995) (stating that the heightened standard is not required when the alleged conflict arises from the fact that the persons administrating the plans are employed by the plan sponsor). Plaintiffs' additional claim that there was a conflict of interest because the definition of SLTE as adopted by the General Pension Board was taken from a longstanding memo from the Manager of Personnel Ishmael is similarly unavailing. Because we find no other evidence of a conflict of interest, we decline to consider the Defendants' decisions under a heightened standard of review above and beyond "arbitrary and capricious." *See Brown v. Blue Cross and Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1564 (11th Cir.1990), *cert. denied*, 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991).

Having thus established our standard of review, we now turn to the Defendants' decision to deny benefits to the Plaintiffs. When reviewing a denial of benefits under the arbitrary and capricious standard, we are behooved to consider only the evidence available to the Plan Administrator at the time the decision was made. *See Taft v. Equitable Life Assurance Society*, 9 F.3d 1469, 1472 (9th Cir.1994); *Voliva v. Seafarers Pension Plan*, 858 F.2d 195, 196 (4th Cir.1988); *Miller v. Metropolitan Life Insurance Co.*, 925 F.2d 979, 986 (6th Cir.1991); *Wolfe v. J.C. Penney Co.*, 710 F.2d 388, 394 (7th Cir.1983). Plaintiffs bear the burden of demonstrating that the decision to deny them benefits was arbitrary and capricious; they simply have not met that burden.

■ As discussed in our findings of fact above, there was a decision by Bethlehem management in 1992 to move all of the Tin Mill Products Group from Bethlehem, Pennsylvania to Sparrows Point, Maryland. FOFN 24. This action was determined to be a relocation because only one position would be terminated, far less than the standard 20% required for a shutdown situation. FOFN 32,33. Bethlehem was very interested in having its Tin Mill Customer Service Representatives move to Sparrows Point because the Customer Service Representatives were in close contact with Bethlehem's customers and had established a good working relationship with them. FOFN 28. As a result, Bethlehem offered jobs to all of its Tin Mill Customer Service Representatives at the Sparrows Point doing the same work, and prepared a package of benefits for those who would accept the jobs. Bethlehem consulted with its Plan Administrator, Mr. Dop-

era, and its personnel and ERISA counsel, and included as part of the package the notification from them that the job offers to move to Sparrows Point would be considered SLTE. FOFN 34,35.

Plaintiffs subsequently complained to many people that this designation would render them ineligible for Rule–of–65 benefits. They sent many memos and letters, one of which made its way to Mr. Dopera and was considered by him to be an application for benefits. FOFN 55. Plaintiffs now claim that the letter was not an application and that Mr. Dopera therefore decided prematurely to deny them benefits. Regardless of Plaintiffs' intent, we consider the decision to treat their memo as a request for benefits to be rational; however, this is also somewhat of a moot point because Plaintiffs did not have a right to the Rule–of–65 benefits at any time pertinent to this litigation. When the decision was made makes little difference in this case.

In the Bethlehem Plan Rule–of–65 benefits are discussed at Section 2.7. This section clearly states that if a worker has at least twenty years of continuous service, where the total of his or her age and continuous service equals at least 65 but is less than 80, the worker meets the bottom line requirements. Thereafter, regardless of whether the employee's service is broken by a shutdown or a layoff in excess of two years, the employee is made ineligible for these benefits if he or she is offered SLTE. A job offer is to be considered SLTE when the employee is physically able to perform the job, the employee has the ability to perform the job, it is not a temporary job, and the wages offered are of at least 85% of the employees current salary if the job is in a different geographic area. FOFN 14, 18.

When Mr. Dopera, and later the General Pension Board, reviewed the first application for benefits, they were aware that each of the Plaintiffs met the minimum requirements of Rule–of–65 benefits, that Plaintiffs had been offered jobs meeting the definition of SLTE at Sparrows Point, and that Plaintiffs had rejected those offers. FOFN 50,51,59. This fact had not changed when plaintiffs made their second, significantly more formal, application. Mr. Dopera concluded that Plaintiffs had therefore rejected offers of SLTE, and denied them benefits.

This decision is not unreasonable, arbitrary or capricious. The evidence shows plainly that Plaintiffs had the ability to do the work of the SLTE, the job offered was not a temporary one, and they were being offered not 85% but 110% of their current salary at the new location. FOFN 40. Plaintiffs' complaint that the jobs are not "suitable" for them personally because of their desire to stay in the Bethlehem area is unavailing; it is clear from the Plan that suitability is determined on an objective, not a subjective, basis. The decision that the circumstances merited a determination that the offer was SLTE is completely rational, and would be upheld by us even under the stricter *de novo* standard.

Plaintiffs' also complain that because the offer of SLTE was made before their last day of work, it is not properly SLTE. They point to the Summary Plan Description, a summary of the Plan, which unartfully states that employees are eligible for benefits if Bethlehem has laid them off and they are not offered SLTE "within 90 days." Mr. Dopera stated that he felt that the offer was a SLTE because it was offered "in connection with" a major employment action, and that Bethlehem usually tried to offer such positions in advance of the layoff period so that the transition will be easier and the employee will have time to make decisions. This position is eminently reasonable and rational. It is also not inconsistent with other District Courts who have interpreted Bethlehem's Plan. In *Oldakowski v. Bethlehem Steel Corporation,* No. 85–588C, slip op. at 14 (W.D.N.Y. January 22, 1987), the court upheld the plan administrator's decision to deny benefits and held that "employees have a right to know what future employment is available to them prior to an actual plant shut-down." A similar decision to inform Bethlehem employees of the job offer and subsequent effect on benefits was upheld in *Hacic v. Bethlehem Steel Corporation,* No. 86–78E, slip op. at 5,9,10 (W.D.N.Y. December 27, 1991). There is no evidence of bad faith on the part of Mr. Dopera or the General Pension Board, who

upon Plaintiffs' appeal of the second ruling, affirmed Mr. Dopera's decision.

Furthermore, this is not inconsistent with the purposes of ERISA and of the Rule–of–65 benefits. ERISA does not require the employer to give any specific benefits. *Hamilton v. Air Jamaica, Ltd.,* 945 F.2d 74, 78 (3d Cir.1991), *cert. denied,* 503 U.S. 938, 112 S.Ct. 1479, 117 L.Ed.2d 622 (1992); *Hlinka,* 863 F.2d at 283. "ERISA's concern is with the administration of the benefit plans and not with the precise design of the plan." *Nazay v. Miller,* 949 F.2d 1323, 1329 (3d Cir.1991); *Brown v. Retirement Committee of the Briggs & Stratton Retirement Plan,* 797 F.2d 521, 528 (7th Cir. 1986), *cert. denied,* 479 U.S. 1094, 107 S.Ct. 1311, 94 L.Ed.2d 165 (1987). The preamble to the discussion of the Rule–of–65 benefits in the Pension Agreement notes that the benefit was created for the purpose of providing "economic protection for long service employees." *Pension Agreement* at 93. It was created to give Bethlehem an incentive to keep its employees employed; if it could not by offering them another job, it would have to pay out benefits. It was not created as an early retirement bonus, or with the benefit as the goal; it was created with the goal of prolonged employment. Therefore, a denial of these benefits based upon a rejection of an offer of continued employment is entirely consistent with the plan.

Plaintiffs' also argue that they were denied benefits in violation of § 1132(a)(1)(B) because of the decision to consider the move to Sparrows Point a transfer of function rather than a shutdown. However, this was a management, rather than a fiduciary, decision. The Third Circuit has held that employers will often wear two hats; when they are wearing their management hats and making business decisions they owe no fiduciary duty to their employees per ERISA. *Nazay,* 949 F.2d at 1329; *see also In re Unisys Corp. Retiree Medical Benefit "ERISA" Litigation,* 57 F.3d 1255, 1261, n. 10 (3d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1316, 134 L.Ed.2d 470, 469 (1996). Certainly, "it defies common sense to suggest that a corporation must allow a retirement board to make personnel decisions." *Nazay,* 949 F.2d at 1330.

Furthermore, there was much evidence to the fact that Bethlehem truly desired that their employees transfer to Sparrows Point so that they could consolidate their services, and continue to maintain contact with their main customers. FOFN 24,28. There was no evidence that the action was done with the purpose of denying Plaintiffs their benefits, or was in any way done in bad faith. *See Berger v. Edgewater Steel Co.,* 911 F.2d 911, 919 (3d Cir.1990), *cert. denied,* 499 U.S. 920, 111 S.Ct. 1310, 113 L.Ed.2d 244 (1991). In fact, Plaintiffs were vested under the plan and will receive deferred pension benefits when they reach the normal retirement age. FOFN 75.

The decision to deny Plaintiffs Rule–of–65 benefits was well within the purpose of ERISA, and consistent with a fair reading of the Plan. It was not arbitrary nor capricious and will consequently be upheld.

### B. Interference with Benefits

Plaintiffs also allege that Defendants interfered with their ERISA rights and benefits in violation of 29 U.S.C. § 1140 when Bethlehem offered Plaintiffs positions at the Sparrows Point Division. To recover under § 1140, the employee must show that the employer made a conscious decision to interfere with the employee's attainment of benefits. The Third Circuit discussed the oscillatory burdens of proof extensively in *Gavalik v. Continental Can Co.,* 812 F.2d 834, 851–853 (3d Cir.), *cert. denied,* 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987). First, the plaintiff must establish a *prima facie* case by demonstrating by a preponderance of the evidence that "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may be entitled." *Gavalik,* 812 F.2d at 852 (*citing* 29 U.S.C. § 1140); *Berger,* 911 F.2d at 922. If the plaintiff can so establish, "the burden of production shifts to the employer to introduce admissible evidence of a legitimate, nondiscriminatory reason for its challenged actions." *Gavalik,* 812 F.2d at 853 (*citing Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981)); *see also Tur-*

ner v. Schering–Plough Corporation, 901 F.2d 335, 347 (3d Cir.1990). Thereafter, if the defendant-employer carries his burden, the plaintiff must "demonstrate that the employer's articulated reason is pretextual, 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Gavalik, 812 F.2d at 853 (citing Burdine, 450 U.S. at 256, 101 S.Ct. at 1095). The Third Circuit has recently clarified this, holding that at all times the plaintiff retains the ultimate burden of proof, and that simple rebuttal proof of the incredibility of the defendant's proffered reasons is not an independent, sufficient means of finding for the plaintiffs. Seman v. Coplay Cement Company, 26 F.3d 428, 439 (3d Cir. 1994).

▄▄▄▄▄ In the instant case, plaintiffs cannot even make out a prima facie case. First, Plaintiffs have not shown that the employer conduct, offering them a job, was prohibited. Section 1140 was designed primarily to prevent "unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." Gavalik, 812 F.2d at 851 (citing West v. Butler, 621 F.2d 240, 245 (6th Cir. 1980)). Certainly, "a fundamental prerequisite to a Section 510 action is an allegation that the employer-employee relationship … was changed in some discriminatory or wrongful way." Deeming v. American Standard, Inc., 905 F.2d 1124, 1127 (7th Cir.1990).

▄▄▄ In 1993, after Bethlehem made the decision to move the Tin Mill products group to Sparrows Point, all of the Plaintiffs were offered jobs, their exact same jobs, at the new location. FOFN 40,50. Offering a job, or the chance to continue employment, has never been prohibited employer conduct, and it would be a ludicrous distortion of ERISA to make it so. In Sallee v. Rexnord Corporation, the Seventh Circuit held that "while Section 1140 protects plan participants from discharge, suspension, and the like, it does not appear to protect them from continued employment." Sallee, 985 F.2d 927, 929 (7th Cir.1993); see also Eret v. Continental Holding, Inc., 838 F.Supp. 358, 364 (N.D.Ill.1993)

(discussing Sallee and stating that the allegation of transferring an employee to keep him employed "is simply not the kind of disruption ERISA is designed to protect"). In Varhola v. Doe, the Sixth Circuit held that regardless of fairness, an employer's decision to retain some employees while allowing others to retire with shutdown pensions is not prohibited conduct under Section 1140. Varhola, 820 F.2d 809, 816–17 (6th Cir.1987); see also Garavuso v. Shoe Corporations of America Industries, Inc., 709 F.Supp. 1423, 1432 (S.D.Ohio 1989) (holding that keeping plaintiff employed is not an adverse employment action) The Third Circuit has also commented on this aspect of ERISA, noting that a colorable claim under Section 1140 "should be limited to actions affecting the employer-employee relationship." Haberern v. Kaupp Vascular Surgeons Ltd. Defined Benefit Pension Plan, 24 F.3d 1491, 1503 (3d Cir. 1994), cert. denied, —— U.S. ——, 115 S.Ct. 1099, 130 L.Ed.2d 1067 (1995); see also Deeming, 905 F.2d at 1127. We note that Plaintiffs' rights to their vested pensions have not been challenged, diminished, or altered. All Defendants have done is offer continued employment to Plaintiffs; this cannot be construed as prohibited employer conduct.

Plaintiffs have also made allegations of interference based on the fact that Mr. Dopera regarded the April 21, 1993 memo as an application for benefits. They claim this necessarily means that he decided the issue "prematurely," and thus interfered with any possible Rule–of–65 rights of Plaintiffs. However, because Plaintiffs status as ineligible in no way changed subsequent to receiving the offer of SLTE on April 22, 1993 and rejecting that offer on April 29, 1993, Mr. Dopera's decision (as discussed above) of May 6, 1993 would have been correct if done at any time. There is no evidence that Mr. Dopera even received the April 21, 1993 memo before April 26, 1993, four days after Plaintiffs were offered SLTE. FOFN 55–58. Certainly, it cannot be ERISA interference for a plan administrator to correctly inform employees of their rights per benefits when it is apparent that they are requesting this information.

■ This finding alone would allow us to find that Plaintiffs have not met their initial burden; however, we discuss the matter further for clarity. Plaintiffs have also not met their burden for the second requirement in the *prima facie* case: that the complained of action was taken for the purpose of interfering with their rights. Plaintiffs cannot credibly claim that they were offered jobs at the Sparrows Point plant primarily so that Bethlehem could save on benefits. There is no evidence of this. Rather, it is clear from the evidence that Bethlehem valued the Plaintiffs' and their connection to Bethlehem's Tin Mill customers, and for this reason desired them to move to the new centralized location of Tin Mill Production. FOFN 28. Bethlehem offered each Plaintiff extensive, expensive benefits and a raise in addition to continued employment. FOFN 37. Indeed, Bethlehem allowed Plaintiffs to go on lay-off status for two years following their last day of employment (after the rest of the Customer Service Representatives moved to Sparrows Point) to permit them to accrue two more years of service and benefits. FOFN 63,64. Plaintiff proffers in vain the alternative, circular argument that the jobs were offered with the purpose of removing Rule–of–65 benefits so that they would be forced to take the jobs offered. This argument is similarly without merit. There is no evidence of bad faith on the part of Bethlehem, nor is there any reason to find incredible the testimony that the jobs were offered for real business reasons and not to rob employees of possible benefits. FOFN 26–28, 37.

Moreover, it is not clear to us that the Rule–of–65 benefits were a right to which Plaintiffs are entitled. The benefits, as we have noted, were created as an incentive for Bethlehem to maintain the employment of long-standing employees. It was a benefit for being forced to retire early. Consequently, it did not operate on the employee's desires as to continued employment or retirement, but on the availability and offering of SLTE. In the case at hand, such SLTE was offered, and rejected by Plaintiffs with full knowledge that while they could certainly end their employment any time they desired, they would not receive Rule–of–65 benefits. To award them Rule–of–65 benefits now

would be an obvious windfall, a contravention of the intentions of the Plan, and nowhere required by ERISA. *See Hlinka*, 863 F.2d at 284–285 (holding that because ERISA specifically refers to normal and not early retirement benefits, "the act was not intended to assure the sanctity of early retirement expectations").

We note that even if Plaintiffs were able to establish a *prima facie* case, Defendants have provided us with more than sufficient evidence, discussed above, to believe that the actions complained of were done for legitimate, non-discriminatory reasons. Because Plaintiffs have made no responsive showing that these explanations are in any way pretextual, we find that they have not met their ultimate burden of proof.

## IV. CONCLUSIONS OF LAW

Consistent with the foregoing findings of fact and discussion, we state the following conclusions of law pursuant to Fed.R.Civ.P. 52(a):

1. Plaintiffs have not met their burden in establishing that the decision to deny them Rule–of–65 benefits was arbitrary and capricious.

2. Defendants decision to deny Plaintiffs Rule–of–65 benefits is reasonable.

3. Plaintiffs have not met their burden to make out a *prima facie* case that Defendants interfered with Plaintiffs' right to Rule–of–65 benefits.

4. Defendants did not engage in prohibited employer conduct by offering Plaintiffs continued work at another plant; this action not taken with the purpose of interfering with any purported pension rights of Plaintiffs.

5. Defendants are entitled to judgment in their favor.

An appropriate order follows.

### *ORDER*

AND NOW, this 18th day of March, 1997, in consideration of the evidence presented in the three day non-jury trial on April 16, 1996, and continuing on November 19 and 20, 1996;

the Stipulation filed November 19, 1996; Plaintiffs' Proposed Findings of Fact and Brief filed December 19, 1996; Defendants' Proposed Findings of Fact, Post Trial Brief, and Responses to Plaintiffs' Proposed Findings of Fact all filed on January 15, 1997; and Plaintiffs' responses thereto filed on January 24, 1997, it is hereby ORDERED 1. JUDGMENT is entered in favor of the Defendants Bethlehem Steel Corporation, Pension Plan of Bethlehem Steel Corporation and Subsidiary Companies applicable to eligible salaried employees, Bethlehem Steel Corporation's General Pension Board, and Plan Administrator and against all Plaintiffs on all claims;

2. This case is CLOSED.